May it please the Court. My name is Wendy Brewer. I'm representing Nightingale Home Health Care. Today, I'm going to address the issues primarily arising out of the Bankruptcy Court Appeals, along with the amicus Professor Potto, and Mr. Abel is going to address the issues arising out of the District Court of Appeal of the Section 1983 Tort Claims. The primary question before the Court today on the Bankruptcy Court side of the Appeals is whether bankruptcy court's jurisdiction over the bankruptcy state's interest in an executory contract, in this case the Medicare Provider Agreement, is barred by the terms of 42 U.S.C. Section 405H. And there's multiple reasons why the District Court opinion in this case should be overruled, and I'd like to just address some of those briefly. In addition to the clear language in 42 U.S.C. Section 405H, which does not address 1334 bankruptcy court jurisdiction, and which has stood unchanged by Congress for the past 30 years, this Court should not extend its reasoning in the bottom metric decision to apply in the case of bankruptcy jurisdiction, because the case, the facts, and the situation in this case is very different than the situation in either bottom metric or the Bayou Shores matter. Initially... You want to take a few moments, Ms. Brewer, and to distinguish that, where the difference lies with bottom metric? Sure. In bottom metric, there's factual differences, and the analysis is different. Bottom metric involved a claim of a provider alleging that the fiscal intermediary was denying their claims without reason. They basically brought to the District Court a dispute with Medicare, and asked the District Court to resolve that dispute with Medicare by bringing the claim against the fiscal intermediary and bringing it through Section 1332 jurisdiction. And Section 1332, diversity jurisdiction, the only reason they were able to use that is because they named the fiscal intermediary instead of going straight to CMS to try to resolve their claims with Medicare. In the incident case, well, and I should also, in the Bayou Shores case, in Bayou Shores, the bankruptcy court didn't just enjoin a termination. That case, the bankruptcy, and allow the fight with Medicare to proceed outside of the bankruptcy court. In Bayou Shores, the District Court went so far as to say, you know what? You've now met the standards, and you shouldn't be terminated, so we're going to allow you to proceed under the Medicare provider agreement, and I'm going to allow you to assume and assign that in part of your, or assume the contract as part of your reorganization. In our case, the bankruptcy court didn't do that. The bankruptcy court was very clear that what the bankruptcy court was doing was simply entering an injunction to maintain the status quo while the appeal and the dispute with Medicare proceeded through administrative channels before the ALJ, the DAB, and eventually working its way to judicial review. The bankruptcy court sought only to preserve value in an executory contract that was property via state. The CMS manual itself recognizes that a Medicare provider agreement is an executory contract, and a bankruptcy court under Section 542 of 541 takes control of assets of the estate, including executory contracts. And in this instance, what the bankruptcy court did was said, you know, I have to consider a number of constituents. I have to consider all the creditors, the debtor. I consider everybody when a case is put in, and we have to deal with the assets of the bankruptcy estate. And in this case, one of the assets is an executory contract. I'm going to maintain the status quo. I'll let them fight it out. We did not ask the judge to allow us to assume that contract or to assign it to anybody. We didn't ask the judge to do anything with that contract other than maintain the status quo while we'll have our dispute with them outside of the bankruptcy court. And the bankruptcy court was very clear in that when entering the injunction. Additionally, Section 1334, bankruptcy court jurisdiction, has a different history than diversity jurisdiction. In bottom metric, this court dealt with diversity jurisdiction, which had always been part of the judicial code. It's changed the, you know, amount of controversy, but bankruptcy jurisdiction as we know it today, and bankruptcy courts, they didn't exist under the judicial code until these amendments were made. If we go back through history, you know, we have the 1939, we've got the judicial code, and 405H barred all of the actions under the judicial code, which included a 13, which included a bankruptcy jurisdiction provision. But it was the district court overseeing bankruptcy referees. And so in essence, what that meant was bankruptcy courts or district courts were essentially sitting in an appellate capacity over referees. A referee couldn't have issued an injunction. There was no statutory authority. In 1948, when those are dispersed into different provisions, it included Section 1334, moved that bankruptcy jurisdiction provision into 1334. In the meantime, in 1976, the Office of Law Revision Council looks at 405H and says, you know what, that needs to be edited because now it refers to the old 28 USC 41. And they said, we only mean to put 1331 and put 1346 in there. Federal question and U.S. is a party. They left out 1334, which, under the old version, wouldn't have been terribly unreasonable because 1334 jurisdiction, under the original codification of 1334, was more in the nature of an appellate type jurisdictional provision. In 1978, Congress enacts the Bankruptcy Reform Act of 1978, establishes bankruptcy courts, establishes the Bankruptcy Code, grants Section 105 authority to bankruptcy courts, which includes the authority to issue injunctions, and starts a whole, there's, it enacts an entire new section, 28 USC 1471, which gave broad sweeping jurisdiction to bankruptcy courts. The Supreme Court recognized it was so broad in Northern Pipeline and Marathon that it needed to be reined in a little bit. We need to move it back under the district courts. So the the provision of 1471 is formed completely outside of the old judicial code, which is what 405H had referred to, and what the bottom metric analysis says, we have to look back at the old 40, or the old judicial code, and if those were barred under the old version of 408, 408, 405H, then then they're still barred today. We didn't mean to make a change, or Congress didn't mean to make a change. But 1471 wasn't there, and the new, 1471 gets moved back and becomes 1334, but it's an entirely different provision. It's not the same jurisdictional statute that was there before. So that, in that analysis, you can distinguish bottom metric where you're talking about section 1332 jurisdiction, which has always been under the judicial code, and always provided essentially the same. Now, what about Bayou Shores? And Bayou Shores? Bayou Shores relied on the bottom metric analysis, and Bayou Shores, again, as I said, in that case the judge, two things. One, the Bayou Shores plaintiffs first sought to get their injunction in district court, which they couldn't do. By the time they got to bankruptcy court, their agreement had already been terminated, and the Bayou Shores court then issues an injunction, and on top of that says, you know what, now we found that you do qualify. So they inserted themselves in the place of, the bankruptcy court in Bayou Shores inserted itself in the place of CMS, and inserted in place of the qualified, and then allowed Bayou Shores to assume the contract and move forward with the reorganization. That's not the case. And I'm going to, yeah, I need to reserve it, and I need to pass on my time to Professor Pato, if that's all right. Thank you. Good morning, Your Honors. Before I engage in the unenviable task of asking a panel to overrule the precedent of this court that had distinguished members on that panel, I'd like to follow up, if I could please, on the one of the questions you asked, Ms. Brewer, which is the distinction between 1332 diversity and 1334 bankruptcy jurisdiction. For the reasons the Ninth Circuit has distinguished those and treated them differently, it is defensible because structurally the in-rem grant of jurisdiction to the bankruptcy courts implicates a comprehensive federal regime where there are multi-parties involved in adjudicating the bankruptcy race. Unlike a one-on-one dispute between a provider and the Medicare agreement, once you enter into bankruptcy, there's a constellation of collective concerns which would be different from a straight-on diversity action sitting in federal courts. And indeed, this court in body metric, if you go through its analysis of the diversity jurisdiction, if we step back, it is a little bit counterintuitive that there's even diversity jurisdiction in the first place with a Medicare dispute. It's a provider or a patient suing the federal government. The only way diversity got in there, which is probably why Congress didn't include it in its list of factors, is through the end run of pleading in the fiscal intermediary through sometimes which there's diverse jurisdiction. And so this court in body metric has quite explicit instruction saying that would undermine the purpose, the efficiency, and the finality in the body metric. It's basically an artful pleading doctrine kind of thing, whereas in bankruptcy, those concerns are quite different. And with all due respect to the Bayou Shores case, and I'm late to the game coming to this area of study. The Bayou Shores case, just like this court earlier in body metric 27 odd years ago, and quite frankly, just like every court that we've looked at so far, has not analyzed this, what we call the proviso, in its full context. These opinions keep quoting 2664B in isolation, and they don't read 2664A and the whole caption of the proviso. And that's, it's laid out in the reply brief on page 11. And the proviso, if it's read in its context with its caption, is about effective dates. And so when it talks about none of these shall change, we start in the context that the first subsection of section 2664 is a retroactivity clause. So the context of the statute says these provisions of the statute shall apply retroactively. Then subsection B says these provisions only go in effect today. But, and then there's a grandfathering clause in part B, it says, but, and this is the language that all the courts have read in isolation, not in the context of this full clause, but none of the amendments shall be construed as changing or affecting rights, liability, etc. before that date. And I believe that the best fair reading of that text is if you have a clause that says this, this has retroactive effect. Some provisions have effect today, but nothing changes anything for people right now. That last provision is a grandfathering clause that refers to cases that are in the pipeline on the effective date that the statute was enacted. No retroactive effect. It does take effect immediately today, but if there's something in the pipeline, there's no change to their rights, liabilities, etc. And with respect to the body metric court and with respect to the Bayou Shores Court, that is not in any of the opinions. In fact, we even tried to look at the briefs to see if the courts were prevented with it. It's hard to find briefs of a certain age. So as far as I know, those courts never even adjudicated that decision. And indeed, it is important because the basis of this proviso is really the only defense to going against the unambiguous text. When it says 1331 and 1346, it really is a difficult textual stretch to say that means a whole bunch of different sections that aren't numbered there. And but for this proviso, which I argue has been repeatedly misinterpreted and misread by courts, we would never be having this complex discussion. We would read the text. We would apply what the text says. And certainly this court's precedence within the past decade, the quartet of cases from this circuit that we cite in our amicus brief, Jaskowski, Logan, Head, and Owner-Operator, take a very clear approach about what the court's role is in fixing mistakes of Congress in its text. I believe my red light is on. So I'll pass on if I may. Thank you. Thank you. Mr. Abel? Thank you. And may it please the court, I think, as with any statutory case, it's a good idea to start with the language of the statute. In particular, 405H, as the Supreme Court has said, the three sentences there have different functions. The one that is the focus of this case is the last sentence, which is no action against the United States, the Commissioner of Social Security, or any employee thereof, shall be brought under, and then it lists statutes, and that's one of the issues here, to recover on any claim arising under this subchapter. Now the claims arising under the subchapter are Medicare claims in the traditional sense, and if you look at the Supreme Court's decisions from Illinois Council, Heckler versus Ringer, and other decisions, they all, at bottom, involved payment of Medicare claims and an adjudication of how those claims ought to be paid. There is no claim in the 1983 case of that type, and in fact, we've not sought payment of Medicare claims, and at this point, after the injunctive relief claims were dismissed, we've not sought any change at all in the termination process. We have not, at this point, we're not asking that the Department of Health be replaced as a surveyor. We're not asking at this point that a report be withdrawn. I can see where arguably those claims might have fallen within Illinois Council or Heckler versus Ringer, but the only remaining claims are for independent constitutional courts that also were independent of the termination of the Medicare contract. The easiest way to see that is with the search and seizure claim. There was, that was done in 2000, February of 2015, had nothing to do with the termination of Nightingale Home Health Care's Medicare contract. Didn't even involve premises of Nightingale Home Health Care, but involved premises of Nightingale Hospice Care, and Are they separate, totally separate entities? They are. The corporate structure is home care providers, and then Nightingale Home Health Care is a subsidiary of that, as is Nightingale Hospice Care. So, yes, they are completely separate entities. So that's the easiest way to see the independent claims. But also, the other claims, the equal protection claims, didn't involve, this Medicare survey didn't necessarily involve any Medicare surveys that resulted in adverse decisions against Nightingale Home Health Care or Nightingale Hospice Care. There were licensing surveys, there were surveys that were conducted that resulted in no adverse action, but they were all part of a campaign of harassment against Dr. Brar and his companies. And so they are not entwined with the adjudication of any Medicare claims. And again, I think, Illinois Council, if you look closely, you can tell the kinds of claims it's talking about are claims that can be recovered under the Medicare statute. And I see I'm into, I think, the rebuttal time for Ms. Brewer. I don't know where we are on time. Well, I know we're reserving four minutes for Ms. Brewer's rebuttal. He's now where? You may have one more minute. I don't want to cut you off. Well, I guess the other thing is on the, I don't think the court should reach the failure to state a claim arguments. The district court should never have reached those once it found it was without jurisdiction. For the reasons in our brief, we believe the complaint does state a claim. And even if it doesn't, the dismissal, a dismissal on 12B6 of the first complaint ordinarily is accompanied by leave to amend. And with that, I will turn it over to the remainder of the time for rebuttal. Thank you, Mr. Ewell. Thank you. All right. Mr. Hunter. May it please the court, I am Kyle Hunter from the Indiana Attorney General's Office representing the state defendants in Case 16-2054. Body metric health services versus Aetna controls in this case for two main reasons. First, here as in body metric, the plaintiffs allege that the defendants committed torts for the manner in which they conducted the Medicare surveys. And second, in both cases intermediaries stood in the place of the Secretary of Health and Human Services and were under his control. Appellees in this case refused to address or appellants in this case refused to address body metric and the controlling authority that it has on this case. This court in body metric spoke about how the term arising under has been directed by the Supreme Court to be read broadly. And in this case, this case arises under the Medicare statute because an entity that was a service provider under the Medicare statute is complaining about the manner, is complaining about the regularity and the intensity of Medicare surveys that were done to ensure that this provider was in compliance with the Medicare statute, with the requirements that they had under the Medicare statute. The Medicare statute is designed to provide health care to, to help provide health care to some of the most vulnerable citizens. And in doing this, Congress allowed the federal government to enter into these contracts with providers. And these providers are subject to, the agreement are subject to inspections or surveys as they're called in this case, to ensure that they're complying with the statutory and regulatory restrictions placed on service providers. And in this case, the reason that these claims arise under the Medicare statute is because at its heart, the complaints by Nightingale and Hospice are that the manner in which these surveys were conducted was unfair. That, at its heart, is a claim that arises under the Medicare statute. Bodymetric also applies here because the state defendants in this case stood as intermediaries for the Secretary of Health and Human Services. And this court in Bodymetric spoke about the expanse of the Medicare statute and the need that Congress intended for organizations and intermediaries to stand in the place of, of the Secretary of Health and Human Services. And they cite to, to congressional history that talks about that, that when these intermediaries are acting, they're acting on behalf of the Secretary and carrying on for him the governmental administrative responsibilities imposed by the bill. In Bodymetric, as well as in American Health Corp. versus Schweitzer, Indiana, in that case, Indiana actors were performing surveys just as they are here. And the court noted that they were acting on behalf of and as agents of the Health and Human Services. And so in those two regards, Bodymetric is controlling here. The appellant, the appellants did not address Bodymetric in any meaningful way. And we ask that this court affirm the district. Thank you, Mr. Hunter. Mr. Clair? Thank you, Your Honor, and good morning. I'm Jeffrey Clair. I'm Justice Department Counsel for the Federal Government. Your Honors, the upshot of the appellant's position here is that the court should overrule its prior decision in Bodymetric. It should go into conflict with the three other courts of appeals that have accepted Bodymetric's analysis in the diversity context, and it should go into conflict with the Eleventh Circuit's recent decision applying the same rationale to litigants asserting bankruptcy jurisdiction. That's a fairly extraordinary request in and of itself, and what I've heard this morning is two basic reasons why an appellant's view of the court should do take that extraordinary step. The first, as Ms. Brewer articulated for the court, there have been a number of amendments in the bankruptcy jurisdiction, the manner in which bankruptcy jurisdiction works over the course of time, substantial changes in bankruptcy jurisdiction since the original enactment of Section 405H in 1939, and therefore somehow the explicit reference in 405H really can't work as it was originally intended. I think in considering that claim, it's worth considering the kind of bankruptcy jurisdiction that existed when Section 405H was enacted in 1939. These are provisions that were formally codified at 28 U.S.C. Section 41, Section 19, and it provided that the district court shall have original jurisdiction, quote, of all matters and proceedings in bankruptcy. It's an extraordinarily broad grant of jurisdiction that was precluded by the original version of Section 405H. Now, certainly there have been changes in the sort of authority that bankruptcy courts can exercise, and now their jurisdiction is expressly derivative of the district court's jurisdiction. There have been additional provisions that give bankruptcy courts or courts exercising bankruptcy jurisdiction, concurrent jurisdiction over matters that would otherwise lie within the exclusive jurisdiction of another form, but none of those are really material to the kind of jurisdiction that was originally precluded in Section 405H, all matters and proceedings in bankruptcy. So we'd submit that that really isn't a particularly compelling reason for this Court to overturn its project. It's a precedent and to go into conflict with four other courts of appeals. The second line of argument I've heard today is that diversity jurisdiction is different, and while the Court addressed diversity jurisdiction in bottom metric, that analysis simply doesn't apply to cases in which the bankruptcy jurisdiction is at issue. That's not really germane to the way the Court analyzed this question in bottom metric. It looked at the text of 405H as originally enacted. It noted that it precluded resorts to all manner of jurisdiction originally codified in Title 24 of the former judicial code. That was a provision that was a kind of catch-all provision that included all the traditional grants of federal district court jurisdiction, diversity jurisdiction, bankruptcy jurisdiction, United States as a defendant jurisdiction. That provision of the code was subsequently recodified, kind of destroying the Coras reference in the original 405H. Congress set out to fix that by looking at a revision proposed by the Office of Law Revision and enacting that Office of Law Revision provision into positive law. There's nothing in the Court's analysis that suggests that any grant of jurisdiction originally codified in the former version of the judicial code should be treated differently, just because the bases of federal court jurisdiction are treated differently. So in the final analysis, the fact that bottom metric involved diversity jurisdiction in this case, involves bankruptcy jurisdiction, is really, in our view, a distinction without a difference. I think it is worth stepping back here from the sort of fine parsing of Section 405H and these principles of codification to consider exactly what Congress is trying to accomplish in Section 405H. As the Supreme Court has said most recently in Illinois Council and in cases like Heckler v. Ringer, it is intended to shield the administrative process from premature judicial intrusion. It is to allow the agency with expertise in these matters to finish its job, to create a factual record, to apply its expertise in a case like this one, involving the termination of a substandard health care provider, to make a determination as to what is the appropriate remedy to protect ultimately the public interest and the health and safety of the beneficiaries who are served by these health care providers. That purpose would really be defeated if the court allows to happen what happened here. You have a bankruptcy court that substituted its own determination of whether the patients were really at risk for the secretary's expert determination. You have a bankruptcy court that, quite extraordinarily in my view, took it upon itself to create a new evidentiary record on this question instead of looking at the administrative record created by the court. You have a bankruptcy court that decided that it wasn't satisfied that the patients were at risk and therefore was going to keep this health care provider in operation, notwithstanding the secretary's very considered determination. The conditions and the manner of service of this health care provider placed its patients at immediate jeopardy of serious harm or death. This is precisely the kind of interference in the secretary's enforcement processes that Congress sought to prevent in Section 405H. On another note, Your Honor, many of these cases, I think in fact really all of them focus on the third section of 405H, the third sentence rather of Section 405H. That's certainly important. That is in our view sufficient to dispose of this case. But the court should not overlook the second sentence of Section 405H, which provides that no findings of fact or decision of the commissioner of Social Security, and you should read secretary there for the commissioner, no findings shall be reviewed by any person, tribunal, or government agency except as herein provide. So what that is is a directive to the courts not to review a decision of the secretary except as provided in the Medicare jurisdictional review scheme, which in turn requires that there be a final decision of the secretary before there is judicial review. And the judicial review proceed only after exhaustion of administrative remedies, a final decision, and in an action in the district court. That sentence, that second sentence of Section 405H, standing alone is sufficient to preclude jurisdiction here. And really the court could even obviate any consideration of the third sentence of Section 405H because the second sentence is so clear. Now the Bayou Shores case does agree with this analysis. Most of its analysis is focused on the bottom metric analysis of the codification history of this statute. But the court there also finds that the second sentence of 405H is clear and precludes jurisdiction. And we urge the court to consider the same result here. Finally, there are some arguments that the grants of bankruptcy jurisdiction independently confer jurisdiction here, notwithstanding any limitations of the Medicare jurisdictional scheme. As a threshold matter, we wouldn't agree with that conceptual framework, that Section 405H is designed to preclude the resort to jurisdiction, other bases of jurisdiction, even if those other bases of jurisdiction could be satisfied. So the fact that something might fall within the grants of bankruptcy jurisdiction is not sufficient given the Section 405H bar. Even on its own terms, however, even analyzing whether this case falls within the... confined solely to whether this case falls within the grants of bankruptcy jurisdiction, we think appellant's claims would fail. Most of their argument is focused on the notion that the Medicare provider agreement is a species of property, it's a rest, and it is subject to the bankruptcy court's exclusive jurisdiction over property of the estate. Now the main problem with that argument is the provider agreement was terminated before the bankruptcy case was commenced. There was no extant provider agreement at the time the petition was filed. Now the bankruptcy court's response to this line of argument was, well, Medicare had announced the termination of the provider agreement, but there were appeal rights pending, and therefore the agreement determination could not be deemed final, and the court cited in support of this argument some state law cases dealing with how franchise agreements are terminated under state law. Well, that, of course, is not how to analyze whether a federal contract is in effect. A federal contract is defined... rights and obligations are defined by federal law, by federal statute, and federal regulation. And here the regulations make clear that the termination occurs first. Any rights of appellate review happen after the termination is in effect, not before. And indeed, I think, you know, that conforms with common sense. When a provider is terminated, it is because the secretary thinks there's a grave threat to it, to the patients being served by that health care provider. Where would the court expect... what kind of timing would the court expect to find with respect to review of that kind of termination? Well, I think it makes sense that Congress would say the termination happens first. Any appeal rights can occur after that. Consistent with the kind of grave threat to the health and safety of the patients that the secretary has found. I see my time has expired, Your Honor, unless there are further questions. What's left of the government's restitution claim? I'm sorry, Your Honor, I didn't quite hear you. What's left of the restitution claim? Well, Your Honor, the restitution claim is a claim that we have redress for payments compelled by the erroneous grant of an injunction. I think Your Honor's question in the briefing suggests that there's a redressability question there. If the restitution claim, even if it is a valid claim, is there anything left, any way the government can vindicate that claim? We'd submit there were two. When we filed this claim in the bankruptcy court, there were several million dollars remaining in the estate, principally intended at that juncture for the payment of claims for administrative expenses. We thought we had a right to, at a minimum, prorate a share of that money that was in the estate. The bankruptcy court disagreed. We appealed to the district court. We sought a stay, preventing disbursement of that money. The court denied the stay, and the money is now out of the estate. Nonetheless, we have appealed that order to the district court. If we were to prevail on that appeal, the case could be sent to the district court, and we could at least attempt to claw back some portion of the money from the other administrative claimants. These are large law firms, accounting firms, the kind of professionals you expect to see the estate. I would surmise that they are good for the money if the court were to conclude that there was an avenue there. And the second avenue, as came out a little bit today, the debtor here, Nottingdale, is part of a corporate family. It is owned by a home care provider. It has affiliates. All the entities within those affiliates have a single shareholder who is the single owner. I'm sure Ms. Brewer will disagree with me chapter and verse in what I'm about to tell the court, but we think there is evidence in the record that given the way the financial transactions occurred among members of this corporate family, we at least have a substantial claim that we can pierce the corporate veil and reach some other parties. And I want to stress to the court, we're not asking the court to resolve that claim. No, I understand. We don't want the court to decide that the veil can be pierced. For purposes of jurisdiction, I think all the court needs to do is satisfy itself that we have a reasonable claim, a potential claim on this record, and we think we have that here. Thank you, Your Honor. Thank you, Mr. Cole. Ms. Brewer? We discussed that. A lot of the argument was on the overruling of biometric, and that is really Professor Potto's specialty, so if it's acceptable, we're going to see the bottom line. You'll yield your time to the professor? I'll yield my time to Professor Potto, and hopefully we've heard all the other issues, too. All right. I thank the gentlewoman from Indiana for yielding her time to me. I want to make very clear that a conflict of the circuits is going to exist. If you do overrule biometric and you distinguish bankruptcy jurisdiction from diversity, you're with the Ninth Circuit. Well, but the Ninth Circuit's got some jurisprudence. You know, that town and country is in tension, isn't it, with some of the later cases? So the Ninth Circuit, I think the Ninth Circuit's position is quite clear. As a matter of its holdings, we can get into dictum if we have time, I doubt we will. If we get into its holdings, they've clearly held that bankruptcy jurisdiction still lies, still lies, and diversity jurisdiction does not lie, for the reasons outlined in biometric. The reasoning in the Eleventh Circuit, and I would say the Third Circuit as well, is just to put them all in the same basket. So I don't want to make your jobs difficult, but there's no getting away. You're going to have to pick some circuit allegiances, and I think for the reasons Ms. Brewer articulated already, it is perfectly plausible to distinguish bankruptcy jurisdiction, which brings me to my next point of rebuttal, that the transformations of bankruptcy jurisdiction in 1978, as corrected in 1984, were categorically different from any grant of jurisdiction which was much narrower in the past, so there's another basis of distinguishing that jurisdiction. I found it telling that my friend did not mention anything about the full clause of the proviso, talking about the caption and talking about the phrase. And I want to emphasize the specific words that the conjunction but in 2664B is fully consistent with that being a grandfathering clause. To read it the way other courts have done, the but should maybe be an and or a new sentence. And second textually, it says before that date. And before that date is the quintessential language of a grandfathering clause when you say you don't change any rights or liabilities that exist before this date when we talk about our enactment. And so I find that absence of any refutation of the full reading of it quite telling, which I think the court should feel comfortable following the text, and it's fine in that regard to overrule body metric, which never had occasion to consider that full text. With regard to the exhaustion doctrine that was brought up during my friend's time, this court's precedents on futility are quite clear. Martin's Ushalela is quoted in the briefs that futility is a perfectly permissible grounds on excusing any exhaustion. As a matter of bankruptcy policy about whether the contract was still part of the estate, of course there was not a time specified for termination which contrasts this case from the Bayou Shores case where a specific time of termination was specified. This just had a general date. And in any event, the conception of property of the state is so broad that even a terminated contract in which there were some appellate rights through the administrative proceeding, property of the state is very generously interpreted in bankruptcy law, and so I would argue that the bankruptcy court did not err in holding that the, we'll call it on life support contract, was still property of the state. It was not terminated by the time specifically specified. Nor did my friend in his lower court proceedings pursue challenging the lack of a stay, and so I don't believe that the, that this issue can be considered that a, sorry, I should say, had a stay been imposed, we might have had some different position on the disposition of the assets and on the challenges presented therein. The next big point, and maybe my last point, may I finish my point? You may make that point. Thank you. I just wanted to speak to the sort of, the bigger philosophical point about was the bankruptcy court interfering with the Medicare and second guessing the Medicare judge, and I think this is why it's so helpful to distinguish this from Bayou Shores. In Bayou Shores, the 11th Circuit case, the bankruptcy judge ordered and permanently enjoyed their license to be resuscitated. It says Medicare is wrong, you're getting your license back, and the Medicare people are like, oh my goodness. In this case, all the bankruptcy judge did was enter a temporary injunction status quo to give them time to go to Medicare and talk about whether their license should be revoked and imposed to stay within the bankruptcy court. I think that's a factual distinction, but from a policy perspective, Professor, it does speak to, though, whether you should just channel those efforts, that is, the Medicare aspect, outside the bankruptcy world. I mean, I... I agree. I'm with you on the point, but I think one of the beauties of bankruptcy is that it allows you to do both. So here's what should happen in bankruptcy. The bankruptcy judge can say, hold on to everything, and then Medicare can say, we're having a dispute, and this really should go before the ALJ, because he just knows or she just knows a lot more about this than you do. This happens all the time with arbitration and bankruptcy. The bankruptcy judge can say, okay, you're right. I'm going to do the other bankruptcy stuff here. I'm going to lift the state. You go forward and tell me what happened in that proceeding, and then come back and let it go, and I'll defer to them. And bankruptcy judges can do it. They do it in arbitration. They say, you guys got an arbitration agreement. This is a valid arbitration agreement. Off you go to arbitration. Report back to us when it's done. You had the power to enjoin, though. You had the power to enjoin. You had the power to stay pending the arbitration. And so what they can say is, pending your resolution in Medicare, we're not going to do anything. We're not going to dissipate assets of this estate because there's other stakeholders here. There's employees who all have claims. And so we have to integrate the bankruptcy system with other administrative systems in this federal government. We have complex environmental laws, complex tax laws, and everything maybe looks like a hammer if you're in the Medicare business, but in bankruptcy there's a more generalized system than in the Medicare business. I appreciate the exchange. Thank you. Thanks to all counsel. The case is taken under advisement.